**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF**
**ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| IN RE: ABBOTT LABORATORIES, ET AL., PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION | MDL NO. 3026 |
| | Master Docket No. 1:22-cv-00071 |
| | Hon. Rebecca R. Pallmeyer |
| WILLIAM BOUCHER, | |
| Plaintiff, | |
| v. | Civil Action Number: 1:23-cv-15304 |
| MEAD JOHNSON & CO, LLC and MEAD JOHNSON NUTRITION CO., | |
| Defendants. | |

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

1.      This action arises out of the injuries suffered by Plaintiff as a premature infant who was fed Defendants' cow's milk-based infant formulas and/or fortifiers. Necrotizing Enterocolitis (hereinafter "NEC") is a deadly intestinal disease characterized by inflammation and injury of the gut wall barrier that may advance to necrosis and perforation of the gut. Advanced cases of NEC may lead to surgery and to death. Significantly higher rates of NEC have been found in premature or preterm babies with low birth weights who are fed cow's milk-based formula or fortifier products. The companies who manufacture these products often intentionally mislabel and misrepresent the contents of the products both to the public at-large and to the healthcare community, passing off these deadly products as something similar to or even superior to human breast milk. Tragically, Plaintiff as a premature infant was fed these cow's milk-based products, developed NEC and suffered significant injuries including extensive economic and emotional

damages.

2.      Plaintiff brings this cause of action against Defendants for claims arising as the direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, failure to warn, and/or sale of the Defendants' cow's milk-based products (collectively "Cow's Milk-Based Products").

## GENERAL ALLEGATIONS

3.      Plaintiff brings this Complaint and Demand for Jury Trial against Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (together "Mead") (collectively "Defendants") and upon information and belief and based upon the investigation of counsel to date, would set forth as grounds the following:

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §1332, as complete diversity exists between Plaintiff and the Defendants, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

5.      Pursuant to Case Management Order No. 11 in MDL No. 3026, Plaintiff may file an action directly into this Court against Defendants. *See* "Cover Sheet for Directly Filed Complaints." Venue is proper as to Defendants pursuant to Case Management Order No. 11.

## PARTIES

6.      Plaintiff was born prematurely at Children's Hospital in Columbia, Missouri on October 26, 2002. Plaintiff developed NEC after being fed Cow's Milk-Based Products. At all times material hereto, Plaintiff was domiciled in and a citizen of the State of Missouri. Plaintiff is currently a citizen of Missouri.

7.     Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC manufacture, design, formulate, prepare, test, provide instructions for, market, label, package, sell, and/or place into the stream of commerce in all fifty states, including Missouri, premature infant formula and premature infant milk fortifier made from cow's milk under the "Enfamil" brand name.

## FACTUAL ALLEGATIONS
### The Scope of the Problem

8.     According to the World Health Organization ("WHO"), babies born prematurely, or "preterm," are defined as being born alive before 37 weeks of pregnancy are completed, like Plaintiff. The WHO estimates that approximately 15 million babies are born preterm every year and that this number is rising.

9.     Nutrition for preterm babies, especially those who have a very low birth weight (under 1500 grams) or extremely low birth weight (under 1000 grams), is significantly important. Since the United States ranks in the top ten countries in the world with the greatest number of preterm births, the market of infant formula and fortifiers is particularly vibrant.

10.     Science and research have advanced in recent years confirming strong links between cow's milk-based products and NEC causing and/or substantially contributing to death in preterm and severely preterm, low-weight infants, along with many other health complications and long-term risks to these babies. Additionally, advances in science have created alternative fortifiers that are derived from human milk and non-cow's milk-based products, however, the

manufacturers of the Cow's Milk-Based Products continue to promote and sell the Cow's Milk-Based Product versions.

**The Scientific Evidence Mounts**

11.     As far back as 1990, a prospective, multicenter study on 926 preterm infants found that NEC was six to ten times more common in exclusively formula-fed babies than in those fed breast milk alone and three times more common than in those who received formula plus breast milk. The study also found that NEC was rare in babies born at more than 30 weeks gestation whose diet included breast milk, but was 20 times more common in those fed cow's milk-based formula only.[1]

12.     A study published in 2009 evaluated the health benefits of an exclusively human milk-based diet as compared to a diet with both human milk and cow's milk-based products in extremely premature infants. The results show that preterm babies fed an exclusively human milk-based diet were 90% less likely to develop surgical NEC as compared to a diet that included some cow's milk-based products.[2]

13.     In 2011, the U.S. Surgeon General published a report titled, "The Surgeon General's Call to Action to Support Breastfeeding." In it, the Surgeon General warned that "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis (NEC)."[3]  This same report stated that premature infants who are not breast-fed are 138% more likely to develop NEC.[4]

---

[1] A. Lucas, T. Cole, *Breast Milk and Neonatal Necrotizing Enterocolitis*, Lancet, 336: 1519-1523 (1990) (emphasis added)
[2] S. Sullivan, et al, *An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products*, JOURNAL OF PEDIATRICS, 156: 562-7 (2010) (emphasis added)
[3] U.S. Dep't of Health & Human Serv., Off. of Surgeon Gen., "The Surgeon General's Call to Action to Support Breastfeeding," p.1, (2011) (emphasis added)
[4] *Id.*

14.     In 2012, the American Academy of Pediatrics issued a policy statement that all premature infants should be fed an exclusive human milk diet because of the risk of NEC associated with the consumption of Cow's Milk-Based Products. The Academy stated that "[t]he potent benefits of human milk are such that all preterm infants should receive human milk... If the mother's own milk is unavailable ...pasteurized donor milk should be used."[5]

15.     Further, a study published in 2013 showed that all 104 premature infants participating in the study receiving an exclusive human-milk based diet exceeded targeted growth standards and length and weight and head circumference gain. The authors concluded that "this study provides data showing that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive human milk-based diet."[6] Thus, inadequate growth was proven to be a poor excuse for feeding Cow's Milk-Based Formula, but the practice has largely continued due to extensive and aggressive marketing campaigns conducted by infant formula manufacturers such as Defendants.

16.     Another study published in 2013 reported the first randomized trial in extremely premature infants of exclusive human milk versus preterm cow's milk-based formula. The study found a significantly higher rate of surgical NEC in infants receiving the cow's milk-based preterm formula and supported the use of exclusive human milk diet to nourish extremely preterm infants in the NICU.[7]

17.     In another study published in 2014, it was reported that NEC is "a devastating disease of premature infants and is associated with significant morbidity and mortality. While the

[5] *Breastfeeding and the Use of Human Milk*, Pediatrics, 129:e827-e84l (2012)
[6] A. Hair, *et al, Human Milk Feeding Supports Adequate Growth in Infants ≤1250 Grams Birthweight*, BMC RESEARCH NOTES, 6:459 (2013) (emphasis added)
[7] E.A. Cristofalo, *et al, Randomized Trial in Extremely Preterm Infants*, J PEDIATR., 163(6):1592-1595 (2013) (emphasis added)

pathogenesis of NEC remains incompletely understood, it is well established that the risk is increased by the administration of infant formula and decreased by the administration of breast milk."[8] The same study found that NEC "is the most frequent and lethal gastrointestinal disorder affecting preterm infants and is characterized by intestinal barrier disruption leading to intestinal necrosis, multi-system organ failure and death.[9] The study noted that "NEC affects 7- 12% of preterm infants weighing less than 1500 grams, and the frequency of disease appears to be either stable or rising in several studies.[10] The typical patient who develops NEC is a premature infant who displays a rapid progression from mild feeding intolerance to systemic sepsis, and up to 30% of infants will die from this disease."[11] Advances in formula development have made it possible to prevent necrotizing enterocolitis, and the "exclusive use of human breast milk is recommended for all preterm infants and is associated with a significant decrease in the incidence of NEC."[12]

18.     In yet another study published in 2014, it was reported that an exclusively human milk- based diet, void of Cow's Milk-Based Products, was associated with "lower mortality and morbidity" in extremely preterm infants without compromising growth and should be considered as an approach to nutritional care of these infants.[13]

19.     In 2016, a large study supported previous findings that an exclusively human milk- based diet in extremely preterm infants dramatically decreased the incidence of both medical and surgical NEC. This was the first multi-year study to compare rates of NEC at various institutions after implementation of a feeding protocol using exclusively human milk. The authors concluded

---

[8] Misty Good, *et al.*, *Evidence Based Feeding Strategies Before and After the Development of Necrotizing Enterocolitis*, EXPERT REV. CLIN. IMMUNOL., 10(7): 875-884 (2014 July) (emphasis added)
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

[13] Steven Abrams, *et al.*, *Greater Mortality and Morbidity in Extremely Preterm Infants Fed a Diet Containing Cow Milk Protein Products*, BREASTFEEDING MEDICINE, 9(6):281-286 (2014)

that the use of an exclusively human milk-based diet is associated with "significant benefits" for extremely preterm infants, and while evaluating the benefits of using an exclusively human milk-based protocol, they noted that "it appears that there were no feeding-related adverse outcomes."[14]

20.     A publication by the American Society for Nutrition, in 2017, noted that human milk has "been acknowledged as the best source of nutrition for preterm infants and those at risk for NEC." The study compared the results from two randomized clinical trials on preterm infants with severely low weight (between 500 and 1250 grams at birth) and compared the effect of cow's milk-based preterm infant formula to human milk in relation to the rate of NEC. Both trials found that an exclusively human milk diet resulted in a much lower incidence of NEC. While the study noted that cow's milk-based preterm formulas provided consistent calories and were less expensive than human milk-based products, the cow's milk-based products significantly increased the risk of NEC and death. The study also noted the "exponential" health care costs associated with NEC and noted data from the U.S. from 2011-2012 that showed that the cost of NEC is $180,000 to $198,000 per infant and nearly doubles to $313,000 per infant for surgically treated NEC. Additionally, NEC survivors accrue substantially higher outpatient costs.[15]

21.     The WHO and United Nation's International Children's Emergency Fund (UNICEF) held a meeting more than two decades ago to address concerns over the marketing of breastmilk substitutes. The WHO Director concluded the meeting with the following statement, "In my opinion, the campaign against bottle-feed advertising is unbelievably more important than the fight against smoking advertisement."[16]

---

[14] Hair, *et al, Beyond Necrotizing Enterocolitis Prevention: Improving Outcomes with an Exclusive Human Milk Based Diet*, BREASTFEEDING MEDICINE, 11-2 (2016) (emphasis added)

[15] Jocelyn Shulhan, *et al, Current Knowledge of Necrotizing Enterocolitis in Preterm Infants and the Impact of Different Types of Enteral Nutrition Products*, ASN ADV. NUTR., 8(1):80-91 (2017) (emphasis added)

[16] Jules Law, *The Politics of Breastfeeding: Assessing Risk, Dividing Labor*, JSTOR SIGNS, vol. 25, no. 2: 407-50 (2000) (emphasis added)

22.     Recognizing the abuse and dangers of the marketing of infant formula, in 1981, the World Health Assembly ("WHA"), the decision-making body of the world's Member States, developed the International Code of Marketing of Breast Milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk and outlawed any advertising or promotion of breast milk substitutes to the general public. Pursuant to Article 5.1 of the Code, advertising of breast milk substitutes is specifically prohibited: "There should be no advertising or other form of promotion to the general public [of breast milk substitutes]." In Article 5.2, the Code states that "manufacturers and distributors should not provide, directly or indirectly, to pregnant women, mothers or members of their families, samples of products within the scope of this Code." In addition, the Code expressly prohibits, "point-of-sale advertising, giving of samples, or any other promotion device to induce sales directly to the consumer at the retail level, such as special displays, discount coupons, premiums, special sales…"[17]

23.     The World Health Organization's 2018 Status Report on this issue noted that "despite ample evidence of the benefits of exclusive and continued breastfeeding for children, women, and society, far too few children are breastfed as recommended." The Status Report states that "a major factor undermining efforts to improve breastfeeding rates is continued and aggressive marketing of breast milk substitutes," noting that in 2014, the global sales of breast milk substitutes amounted to US $44.8 billion and "is expected to rise to US $70.6 billion by 2019."[18]

24.     Recognizing a shift in the medical community towards an exclusively human milk-based diet for preterm infants, the Defendants began heavily promoting "human milk fortifiers,"

---

[17] *See* Int'l Code of Marketing of Breast-Milk Substitutes, May 21, 1981, WHA 34/1981/REC/2, Art.5.3
[18] *Marketing of Breast-milk Substitutes: Nat'l Implementation of the Int'l Code, Status Report 2018*. Geneva: World Health Org., 2018, p.21 (emphasis added)

a name which misleadingly suggests that the product is derived from human milk, instead of being derived from cow's milk.

25.     The Defendants have designed competing, systematic, powerful, and misleading marketing campaigns to persuade physicians and parents to believe that: (1) cow's milk-based formula and fortifiers are safe; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; and (3) physicians consider their Cow's Milk-Based Products a first choice. Similarly, the Defendants market their products for preterm infants as necessary for growth and perfectly safe for preterm infants, despite knowing the extreme risks posed by Cow's Milk-Based Products, especially to preterm, low weight infants like Plaintiff.

## The Inadequate Warnings

26.     Defendants promote the use of their preterm infant Cow's Milk-Based Products to parents, physicians, hospitals, and medical providers as safe products that are specifically needed by preterm infants for adequate growth.

27.     Despite the knowledge of the health risks posed to preterm infants ingesting the Cow's Milk-Based Products, including the significant risk of NEC, Defendants did not warn parents or medical providers of the risk of NEC in preterm infants, nor did Defendants provide any instructions or guidance on how to properly use its Cow's Milk-Based Products so as to lower the risk or avoid NEC.

28.     In fact, Defendants did not provide any warning on their labeling, websites, or marketing materials that warns that their Cow's Milk-Based Products exponentially increase the risk of NEC in preterm infants, or that human breast milk, donor breast milk, and human breast milk-based formulas and fortifiers are much safer for preterm babies than their Cow's Milk-Based Products.

## Safer Alternative Design

29.    Plaintiff alleges there were reasonable, safe, and economically and technologically feasible alternative designs of Cow's Milk-Based Products for premature infants available to Defendants when the formulas and fortifiers at issue in this case were sold. Moreover, Plaintiff alleges that human milk-based products from donor breast milk are safer alternatives to cow's milk-based formulas and fortifiers for premature infants, particularly premature infants in the low to extremely low birth weight category such as Plaintiff.

## Plaintiff and the Dangerous, Defective Products

30.    Plaintiff was born prematurely, at 29 weeks and 6 days gestation, at Children's Hospital in Columbia, Missouri on October 26, 2002.  At birth, Plaintiff weighed 1164 grams.

31.    Plaintiff was fed Mead's Enfamil product starting on day 4 of life .  Plaintiff's feeds were held on November 1, 2002 and restarted on November 5, 2002.

32.    On or about November 14, 2002, while still consuming Defendants' formula, Plaintiff was diagnosed with necrotizing enterocolitis and sump suction was placed and he was intubated and placed on antibiotics.

33.    On November 15, 2002, Plaintiff underwent surgery for a perforated bowel related to his NEC.  During the procedure, the surgeon resected approximately twenty percent (20%) of the small bowel plus a portion of the ascending colon and ostomy was placed.  Plaintiff required two blood transfusions during his surgery.  Plaintiff was noted to have confirmed sepsis.

34.    Plaintiff did well for a time but on or about December 13, 2002, it was noted that patient demonstrated increased feeding difficulty over the past 36 hours with decreased PO intake and increased abdominal girth and water-loss stools.  Feeds were pulled back and KUB showed increased bowel wall edema and dilation of loops without evidence of free air or intramural air.

35.     On or about December 14, 2002, Plaintiff was noted to be clinically improved enough to resume small feedings.  However, on or about December 19, 2002, Plaintiff developed abdominal distension and residuals.  KUB showed dilated loops of bowel and a suspected functional partial small bowel obstruction.  The surgeon was consulted regarding possible strictures and planned to begin daily dilatations of the ostomy.

36.     On December 20, 2002, Plaintiff's surgery team performed dilation procedure with reduction of abdominal girth.  The surgery team continued to perform daily dilations from December 21, 2002 – December 29, 2002.  Plaintiff was ultimately discharged from Children's Hospital on January 3, 2002.

37.     On or about March 25, 2003, Plaintiff was taken to the Lake Regional Health emergency room due to concerns of his colostomy not working.  Plaintiff was transferred via ambulance to University Medical Center in Columbia, Missouri.

38.     On or about March 26, 2003, Plaintiff underwent an exploratory laparotomy, derotation of intestinal volvulus and division of band, along with the insertion of right subclavian central venous line.  During the surgery, Plaintiff was found to have small intestinal obstruction due to adhesions.

39.     Following the exploratory laparotomy procedure, Plaintiff was observed in the pediatric intensive care unit, but his condition continued to deteriorate and he developed acidemia and hypoxemia.

40.     On or about March 28, 2003, Plaintiff was again taken to the operating room for a second-look procedure, during which he was found to have ganglion of the small intestine. Excision of the small bowel was performed with the formation of ileostomy.

41.     On or about April 3, 2003, Plaintiff was taken back to surgery for the placement of

a Broviac central line.

42.     Plaintiff was discharged from University Medical Center on or about April 14, 2003, with a discharge diagnosis of Short Bowel Syndrome.

43.     From 2003 - 2008, Plaintiff was hospitalized multiple times and underwent numerous additional surgeries and procedures related to his extensive injuries.

44.     In 2008, Plaintiff underwent an isolated small bowel transplant. Following the transplant, Plaintiff continued to require routine medical monitoring and treatment.

45.     At the time Plaintiff was diagnosed with NEC, Plaintiffs' parents were unaware of the fact that the Defendants' Cow's Milk-Based Products which Plaintiff consumed could have caused or substantially contributed to his development of NEC and resulting injuries.

## COUNT I: STRICT LIABILITY – DESIGN DEFECT

46.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

47.     Defendants, as the manufacturers and/or sellers of Cow's Milk-Based Products for premature infants, owed a duty to the consuming public and Plaintiff to manufacture, sell, and distribute their products in a manner that was merchantable, reasonably suited for its intended use, and not unreasonably dangerous.

48.     Defendants knew that their products would be consumed by premature infants and knew or reasonably should have known that ingestion of their Cow's Milk-Based Products significantly increased the user's risk of NEC, serious bodily injury, and death. Such use of their products therefore was neither merchantable nor reasonably suited for its intended purpose and was unreasonably dangerous to premature infants like Plaintiff.

49.     Despite carrying risks that exceeded any reasonable buyer expectations, these

defective formulas and fortifiers were sold and aggressively marketed by Defendants. Similarly, despite the fact that any benefits obtained by ingesting Defendants' products were greatly outweighed by the significant risk of serious injury and death from NEC, Plaintiff consumed Defendants' unreasonably dangerous products. No ordinary consumer would anticipate such risk from premature infant formulas and fortifiers.

50.     Defendants' products contained bovine milk, derivatives, and proteins when they departed Defendants' manufacturing facilities and left their control. Mead knew or reasonably should have known that unlike cow's milk-based products, human milk-based formulas and fortifiers are not associated with an increased risk of NEC, serious injury, and death.

51.     Nonetheless, Defendants did not develop a human-milk based product or reformulate their products for premature infants in any way so as to reduce the incidence of NEC and NEC- associated serious injury and death. Doing so would have been safer for consumers like Plaintiff and economically and technologically feasible for the manufacturers themselves, given that donor breastmilk is an available alternative which can be used to make formulas and fortifiers.

52.     Plaintiff consumed Defendants' products, which directly and proximately caused his development of NEC and resulting injuries.

53.     The injuries suffered by Plaintiff were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

54.     WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## COUNT II: STRICT LIABILITY – FAILURE TO WARN

55.     Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

56.     A manufacturer must provide adequate warning of dangers inherent in the improper use of the product, and adequate instructions for the safe use of the product. The warning must be in a form which could reasonably be expected to catch the attention of, and be understood by, the ordinary user. Thus, a product is defective if, at the time of sale, the warnings and instructions included with the product fail to provide adequate warnings of the dangers inherent in the product's proper use.

57.     Mead, as the manufacturer and/or seller of the infant products at issue in this litigation, owed a duty to the consuming public and Plaintiff to provide adequate warnings or instructions about the dangers and risks associated with the use of their cow's milk-based formulas and fortifiers for premature infants, including the risk of NEC, life-altering injuries resulting from NEC, and death.

58.     Defendants' duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. Given that their products are designed and manufactured using bovine-based ingredients, Defendants assumed a duty to warn of the unreasonable risk of harm created by those ingredients. By failing to do so, Mead made the formulas and fortifiers at issue in this suit unreasonably dangerous.

59.     Mead breached their duty to warn of the foreseeable risks posed by the infant formulas and fortifiers consumed by Plaintiff. They knew or should have known that their bovine-based products, which were specifically intended for premature infants, could possibly cause such infants to develop NEC, severe injuries associated with NEC, or death. Defendants failed to

14

provide adequate warnings of those risks. Among other risks, Defendants:

    a.  Failed to warn generally about NEC and specifically that cow's milk-based products significantly increase the risk of NEC, serious injury, and death in premature infants; and/or

    b.  Failed to provide proper instructions, guidelines, studies, or data on when and how to feed its products to preterm infants in order to decrease the risk of NEC; and/or

    c.  Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like Plaintiff; and/or

    d.  Included warnings and instructions that were vague, confusing, inadequate, and specifically addressed certain conditions, yet did not warn of the significantly increased risk of NEC and death; and/or

    e.  Failed to include a warning akin to a 'black-box warning' to alert that their products are known to dramatically increase the incidence of NEC and death in premature infants when compared to breastmilk; and/or

    f.  Failed to provide studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    g.  Failed to insert a warning or evidence-based instructions to healthcare providers and other medical staff in the hospital that parents should be given information necessary to make an informed choice about whether to allow their babies to be fed Defendants' products, notwithstanding their substantial risks; and/or

    h.  Failed to provide a warning in a method reasonably calculated and/or expected to reach the preterm baby's parents; and/or

    i.  Failed to provide statistical data and evidence showing the magnitude of increased

risk of NEC in premature infants associated with cow's milk-based formulas and fortifiers; and/or

j. Failed to otherwise warn physicians, and healthcare providers of the extreme risks associated with feeding preterm infants Cow's Milk-Based Products; and/or

k. Failed to send out "Dear Dr." letters warning of the risks of NEC and the current scientific research and data to better guide the hospitals and physicians to better care for the extremely preterm infants.

60.     Defendants knew that their defective products posed a risk to premature infants when used as intended because they were cow's milk-based, which longstanding research and scientific studies have shown drastically increases the incidence of NEC in premature infants when compared to breastmilk or donor milk. No ordinary consumer would expect such risks from formulas and fortifiers specifically designed for physically vulnerable premature infants.

61.     The products contained these bovine-based ingredients at the time of manufacturing and when they left each manufacturer's control, but Defendants did not include any warnings about the risk of these harms, which rendered the warnings completely inadequate. If the healthcare providers had been warned of the existence, extent, and/or magnitude of the extreme risk associated with Defendants' products, Plaintiff would not have been fed these formulas and/or fortifiers. Similarly, if Plaintiffs' parents had been alerted to the danger posed by Defendants' formulas, they would not have permitted Plaintiff to ingest them.

62.     As a direct and proximate result of Defendants' insufficient warnings, Plaintiff ingested cow's milk-based products and subsequently developed NEC, which would not have occurred if Defendants had not breached their duties to the consuming public and to premature infants like Plaintiff.

63.    The injuries suffered by Plaintiff were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

64.    WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## COUNT III NEGLIGENCE

65.    Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

66.    The manufacturers of the premature infant formulas and fortifiers at issue in this suit owe the consuming public in general, and Plaintiff in particular, a duty to exercise reasonable care in designing, testing, manufacturing, inspecting, and distributing a product free of unreasonable risk of harm to anyone who is likely to be exposed to the harm when the product is put to its intended use or to any use that is unintended but is reasonably foreseeable. A product is defective if at the time of sale, it is designed in such a way that it poses harm and risk of injury when used by the intended consumer in the manner the manufacturer has directed and designed.

67.    At all times relevant to this action, Plaintiff's health care providers used the products at issue in their intended manner and for their intended purpose.

68.    Plaintiff was harmed by Defendants' defective Cow's Milk-Based Products, which were directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed by Defendants, who thereby breached their duty to the general public and Plaintiff.

69.     Any prudent manufacturer of those products reasonably should have known or knew at the time of production that premature infant formula and fortifiers made from cow's milk dramatically increase the incidence of a devastating and potentially lethal gastrointestinal disease. Specifically, Defendants failed to act in a reasonably prudent manner and breached their duty to Plaintiff and the consuming public by:

a.   Failing to warn generally about NEC and specifically that cow's milk-based products significantly increase the risk of NEC, serious injury, and death in premature infants; and/or

b.   Failing to provide proper instructions, guidelines, studies, or data on when and how to feed its products to preterm infants in order to decrease the risk of NEC; and/or

c.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like Plaintiff; and/or

d.   Including warnings and instructions that were vague, confusing, inadequate, and specifically addressed certain conditions yet did not warn of the significantly increased risk of NEC and death; and/or

e.   Failing to include a warning akin to a 'black-box warning' to alert that their products are known to dramatically increase the incidence of NEC and death in premature infants when compared to breastmilk; and/or

f.   Failing to provide studies that linked cow's milk-based products to NEC and death in premature infants; and/or

g.   Failing to insert a warning or evidence-based instructions to healthcare providers and other medical staff in the hospital that parents should be given information

necessary to make an informed choice about whether to allow their babies to be fed Defendants' products, notwithstanding their substantial risks; and/or

h.  Failing to provide a warning in a method reasonably calculated and/or expected to reach the preterm baby's parents; and/or

i.  Failing to provide statistical data and evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based formulas and fortifiers; and/or

j.  Failing to otherwise warn physicians, and healthcare providers of the extreme risks associated with feeding preterm infants Cow's Milk-Based Products; and/or

k.  Failing to send out "Dear Dr." letters warning of the risks of NEC and the current scientific research and data to better guide the hospitals and physicians to better care for the extremely preterm infants.

70.  Defendants' formulas and fortifiers contained a design defect that made the products unreasonably dangerous to patients. Specifically, there was a design and/or manufacturing defect that would result in serious risk of bodily injury. That design defect in the Cow's Milk-Based Products existed when those products left the manufacturer's control and was readily apparent in the scientific data and longstanding research studies that have concluded that Defendants' products carried unreasonable risks of NEC which far outweighed any of its benefits for premature infants like Plaintiff.

71.  Nevertheless, Defendants also failed to act in a reasonably prudent manner and breached their duty by failing to perform data collection, detection, assessment, monitoring, prevention, reporting or disclosure of adverse clinical outcomes in infants who consume their products. This failure to continuously and vigorously study their products and determine how

they can be used safely directed resulted in their failure to help prevent devastating clinical outcomes in premature infants like Plaintiff.

72.     As a direct and proximate result of Defendants' negligence, Plaintiff ingested cow's milk-based products and subsequently developed NEC, which would not have occurred if Defendants had not breached their duties to the consuming public and to premature infants like Plaintiff.

73.     The injuries suffered by Plaintiff were the result of intentional acts or omissions which were the result of willful and wanton conduct by the Defendants and/or were done by Defendants with reckless disregard of the rights of Plaintiff. Thus, Plaintiff seeks punitive damages in an amount to be determined by the jury.

74.     WHEREFORE, Plaintiff prays for judgement against Defendants for a fair and reasonable sum in excess of $75,000, for punitive damages, together with interest and costs expended herein, and such further relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

75.     WHEREFORE, Plaintiff prays for judgment as follows:

a.  For compensatory damages in an amount to be proven at trial;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Defendants' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For interest as permitted by law;

e. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

f. For such other and further relief as the Court deems proper.

## **DEMAND FOR JURY TRIAL**

76. Plaintiffs hereby request a trial by jury on all issues triable by jury.


Dated: October 25, 2023                     Respectfully Submitted,

                                            **ALLEN & NOLTE, PLLC**

                                            /s/ Jennifer Nolte
                                            John H. Allen, III, Esq. - Trial/Lead Counsel
                                            Texas Bar No. 00788798
                                            trey@allennolte.com
                                            Jennifer Nolte, Esq.
                                            Texas Bar No. 24007755
                                            jnolte@allennolte.com
                                            5445 La Sierra Drive, Suite 350
                                            Dallas, Texas 75231
                                            Tel: (214) 521-2300
                                            Fax: (214) 452-5637

                                            *Attorneys for Plaintiff*